**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KAREN REED, ) | |
| O/B/O C.A.R.,[1] ) | CASE NO.   1:07-cv-3335 |
| ) | |
| Plaintiff, ) | JUDGE NUGENT |
| ) | |
| v. ) | MAGISTRATE JUDGE VECCHIARELLI |
| ) | |
| MICHAEL J. ASTRUE, ) | |
|   Commissioner of Social Security, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |

Plaintiff, Karen Reed ("Reed"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Reed's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a) and 1382a.  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the court should AFFIRM the decision of the Commissioner.

I. Procedural History

Reed filed an application for SSI on March 30, 2003 on behalf of her daughter,

---

[1] Local Rule 8.1(a)(2), "If the involvement of a minor child must be mentioned, only the initials of that child should be used."

C.A.R. Reed alleged disability beginning July 1, 2001.[2] Reed alleged that C.A.R. was disabled due to the effects of lead poisoning and problems with speech, development, and breathing. Reed's application was denied initially and on reconsideration.

Reed requested an administrative hearing. On March 13, 2006 Administrative Law Judge ("ALJ") Edmond Round held a hearing at which Reed was represented by counsel and testified on behalf of C.A.R. Cheryl Morrow-White, M.D., also testified as a medical expert ("ME"). On November 13, 2006, the ALJ held a supplemental hearing at which Reed and Dr. Morrow-White again testified. The ALJ issued a decision on December 27, 2006 determining that C.A.R. was not disabled. When the Appeals Counsel denied Reed's request for a review on September 12, 2007, the ALJ's decision became the decision of the Commissioner.

Reed filed an appeal in this court on October 26, 2007. Reed contends that the ALJ's opinion is not supported by substantial evidence because he failed to consider and give weight to all the evidence, including the testimony of Reed. The Commissioner replies that the ALJ's decision is supported by substantial evidence and that the ALJ considered and gave appropriate weight to all the evidence in the record, including Reed's testimony. Reed also contends that the ALJ failed to consider that Reed's impairments in combination render her disabled. The Commissioner replies that the ALJ considered and rejected this possibility.

---

[2] Defendant points out that 20 CFR §§ 416.202 and 416.501 specify that the earliest a claimant can be eligible for SSI is the month after the month in which the application was filed. C.A.R. cannot be eligible for SSI, therefore, before April 2003.

II. Evidence

*A. Medical evidence*

C.A.R. has a history of lead poisoning.  In October 1999, her lead level was 33.6, and she suffered from anemia that was thought to be secondary to her unusually high levels of lead.  Transcript ("Tr."), p. 301.  In December 1999, her lead level was 25.  *Id.*

Lisa S. Stanford, Ph.D., a pediatric neuropsychologist, examined C.A.R. on June 8, 2001.  Tr. at 288-93.  She noted that C.A.R.'s blood lead level had never fallen below 22 and had been as high as 45 and that neurological evaluation revealed obstructive sleep apnea and anemia.  Reed told Dr. Stanford that C.A.R. had been developmentally slow in walking and crawling, sometimes fell down, and was unclear in her speech.  Dr. Stanford found C.A.R. to be "very pleasant and interactive . . . Her eye contact was good, she displayed bright affect, and she was very engaging."  Tr. at 288.  C.A.R.'s speech was sometimes slurred and was occasionally difficult to understand.  Results of the Wechsler Preschool and Primary Scale of Intelligence--Revised ("Wechsler IQ test") indicated intellectual functioning in the borderline range with borderline nonverbal abilities and low average verbal intellectual ability.  Results of the NEPSY, a developmental neuropsychological assessment, indicated attention and executive skills in the high average range, an ability to recall stories and read sentences in the average range, verbal fluency, and an ability to generate language upon command.  She had difficulty, however, on measures of puzzle assembly, verbal comprehension and expression, visual constructional planning, and tasks of sensory motor functioning.  McCarthy's Scales of Children's Abilities revealed overall performance for growth and fine motor functioning in the borderline range. C.A.R. demonstrated good ability, however, in imitating gross motor actions.  The Bracken

Basic Concept Scale--Revised ("BBCS--R") indicated that C.A.R., who was four years and three months old at the time, was delayed in performance development by one year and one month. The Achenbach Child Behavior Checklist indicated that C.A.R.'s adaptive skills were the equivalent to an age functioning of two years and nine months and her communication ability as equivalent to an age functioning of seven months to three years and two months. Dr. Stanford summarized her impressions as follows:

> [C.A.R.] demonstrates suppression for visual spatial functioning and speed of processing not unexpected for someone with elevated blood levels. She also is experiencing some delay for motor development and speech. Her attention and concentration skills are good for certain tasks, but her visual perceptual difficulties and delayed early academic skills will place her at risk in the regular classroom. She is also somewhat delayed for adaptive behavior skills. In combination, [C.A.R.]'s current intellectual functioning places her in the borderline range and at the Developmentally Handicapped level according to Special Education Classification. It is recommended that [C.A.R.] be provided with an Individualized Education Plan (IEP) under the category of Preschooler with a Disability to address her gross and fine motor delays, her language delays, and her mild emotional immaturity.

Tr. at 290. Dr. Stanford found no excessive problems with attention, hyperactivity, or impulsivity. She recommended an IEP that would provide C.A.R. with occupational therapy, speech therapy, and physical therapy. Dr. Stanford also recommended chelation treatment for C.A.R.'s elevated lead levels, increased iron intake, and later re-evaluation.

Ann Marie Kalata, D.O., C.A.R.'s treating physician, examined C.A.R. on March 11, 2002. Tr. at 267-69. She found C.A.R. to be normal in almost all respects, including in elimination, ears, and gait. Dr. Kalata noted C.A.R.'s exposure to lead but found her to be a "well 5 year old" with "[n]ormal growth and development." Tr. at 268.

Reed reported to Dr. Kalata on April 10, 2002 that C.A.R. had been bedwetting for more than a month. Tr. at 336. Dr. Kalata examined C.A.R. on August 28, 2002 for

4

problems with dry skin.  Tr. at 251-52.  She noted, "Bedwetting frequently.  Mom notes she drinks a lot.  Denies thirst or lethargy."  Tr. at 251.

Dr. Kalata examined C.A.R. again on January 17, 2003.  Tr. at 244-45.  Dr. Kalata ordered a check of C.A.R.'s lead levels and noted that C.A.R. had been removed from her previous high-lead housing environment.  Reed expressed concern to Dr. Kalata that C.A.R. was moving too slowly, did not bend her knees, and had trouble pushing bicycle pedals down.  Reed thought that C.A.R. needed an IEP.  C.A.R. complained of several days of ear pain, although the doctor found her ears to be normal to visual inspection.

Reed brought C.A.R. to Dr. Kalata again on January 27, 2003.  Tr. at 241-42.  C.A.R. had been suffering from ear pain for two weeks with worsening symptoms.  Dr. Kalata prescribed amoxicillin and noted that C.A.R. was scheduled for an ear, nose, and throat examination in February.  A hearing examination on February 4, 2003 revealed mild to moderate hearing loss bilaterally.

Dr. Stanford evaluated Reed for a second time on February 18, 2003 at Reed's request.  Tr. at 305-11.  Reed indicated that C.A.R. was having increasing difficulty concentrating and maintaining attention in school and was having difficulty hearing.  Dr. Stanford noted that C.A.R. was scheduled for surgery to open channels in her ears and remove adenoids and tonsils.  C.A.R. was alert and sociable throughout testing, but her attention span was short, especially on verbal tasks, and she engaged in increased physical activity as she lost interest.  Also, her effort level varied throughout testing, and she needed increased breaks between tests. Results of the Wechsler IQ test indicated low average intelligence, with particular deficits in visual constructional ability and visual planning on performance tasks.  She was also weak on word definitions but she scored well

5

on her general fund of information, comprehension ability, verbal abstract reasoning, and verbal repetition skills. Administration of the NEPSY led Dr. Stanford to conclude that C.A.R.'s sensory motor functioning had significantly improved but that her ability to sustain auditory and visual attention had decreased. The BBCS--R indicated a significant improvement in pre-academic skills and school readiness, with C.A.R. scoring in the average range. C.A.R. scored in the high average range on the Verbal Fluency subtest of the McCarthy Scales of Children's Abilities. C.A.R. scored in the borderline range, however, in tests of fine motor skills. She was able to perform all tasks requiring gross motor skills, such as walking forwards and backwards, walking on tiptoe, skipping, and standing on one foot. The Connors Parent Rating Scale--Revised indicated significant problems with inattention, including problems with distractibility and avoidance of sustained mental tasks. The Vineland Adaptive Behavior scales indicated that although C.A.R. is at the low adaptive level, she had improved since she was last tested. Dr. Stanford summarized the results of testing as follows:

> [C.A.R.] continues to demonstrate low average intellectual functioning, with more suppression of her visual spatial and nonverbal skill abilities in comparison to verbal abilities. She is improved with regard to sensorimotor, verbal fluency, and pre-academic skills. However, her auditory and visual attention span are much more disrupted, and she is still struggling on tasks of gross and fine motor functioning. Her adaptive behavior skills are still within the borderline range, but she is making progress in these areas. Mrs. Reed endorses continued concern with regard to [C.A.R.]'s attentional difficulties, distractibility, and slow learning progress. However, based on this current evaluation, [C.A.R.]'s memory skills are within the average range, and she is demonstrating very good pre-academic skills for understanding concepts, as well as identifying colors, numbers, and letters. Her other academic skills of reading and writing were not assessed during this evaluation due to her good performance on pre-academic skills tests. [C.A.R.] will likely have some difficulty in the first grade, particularly because of her fine motor deficits and her visual spatial difficulties. She also has an extremely short attention span and is very easily distracted. It is recommended that her school district consider placing her under an Individualized Education Plan (IEP) under Other Health Impairment (OHI)

>because of her decreased attention span, decreased alertness, and cognitive deficits likely secondary to her previously elevated blood lead levels.

Tr. at 308-09. Dr. Stanford also recommended medical treatment to improve C.A.R.'s attention, extra time to complete classwork, assistance in staying on task, and teacher awareness of her hearing problems.

Dr. Kalata saw C.A.R. on February 28, 2003 for an ear check. C.A.R. complained of ear pain and exhibited a rash under her chin. Tr. at 233-34. Dr. Kalata noted a 10% loss of hearing in both ears and C.A.R.'s upcoming ear and throat surgery,. The Dr. recommended a change of soap, use of lotion, and reduced bathing for C.A.R.'s rash.

On March 6, 2003, C.A.R. underwent pressure-equalization ("PE") and tube insertion surgery to improve drainage. Tr. at 229-30. Doctors also removed her adenoids and tonsils. There were no complications.

On March 12, 2003, Dr. Kalata prescribed Adderall for C.A.R. for attention problems. Tr. at 226-27.

A post-surgical follow-up examination on April 16, 2003 found that C.A.R. had recovered slowly but satisfactorily. Tr. at 319. The surgical sites had healed well, and Reed reported the elimination of snoring and reduced bedwetting.

C.A.R. reported to Dr. Kalata on April 28, 2003 with ear and tooth pain. Tr. at 317-18. She had suffered a fever the night before, but the fever was gone on the day of the visit. Dr. Kalata noted that C.A.R. was doing well and "has improved in school as evidenced by her report card." Tr. at 317.

Michael Leach, Ph.D., a clinical psychologist, examined C.A.R. at the request of the Bureau of Disbility Determination ("Bureau") on June 20, 2003. Tr. at 414-17. Reed told

Dr. Leach that C.A.R. sometimes had trouble pronouncing words, was slow on following directions, forgets directions, is easily distracted, and had trouble with urinary incontinence most nights and sometimes during the day.  Dr. Leach noted that C.A.R. had a verbal IQ of 84, a performance IQ of 77, and a full scale IQ of 78, indicating a borderline range of intelligence.  Dr. Leach found C.A.R. to be neatly dressed and groomed, overweight, and pleasant.  C.A.R. was engaged, co-operative, and attentive throughout the interview.  The doctor noted no problems with inattentiveness or hyperactivity nor any problems with the flow or content of speech, including problems with pronunciation.  C.A.R. denied depression or anxiety, and there were no symptoms of psychosis or other cognitive disturbance.  Her insight and judgment were consistent with her age.  Dr. Leach attributed C.A.R.'s borderline intellectual functioning and developmental delays to her history of elevated lead levels.  He assigned her a Global Assessment of Functioning ("GAF") of 71.[3]

On June 30, 2003 Steven J. Meyer, Ph.D., a psychologist, reviewed the evidence in C.A.R.'s file at the request of the Bureau and completed a Childhood Disability Evaluation Form.  Tr. at 418-24.  Dr. Meyer opined that C.A.R. had severe impairments but did not have an impairment or combination of impairments that met, were medically equal, or functionally equal to a listing.  He evaluated C.A.R. as having less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, caring for herself, and health and physical well-being.  He found no limitations in moving around and manipulating objects.  On July 8, 2003 Sylvia B.

---

[3] A GAF of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychological stressors (*e.g.*, difficulty concentrating after a family argument); no more than slight impairment in social, occupational, or school functioning (*e.g.*, temporarily falling behind in schoolwork).

Vasquez, M.D., concurred in Dr. Meyer's assessment.  Tr. at 420.

Dr. Kalata examined C.A.R. on October 7, 2003.  Tr. at 399-400.  Reed reported that she was regularly wetting the bed and occasionally having accidents with stool.  Reed also reported that she was in special education class at school and was doing her work without behavioral problems.  Reed was pleased with C.A.R.'s progress.  Dr. Kalata's examination revealed no physical abnormalities, and she found C.A.R. to be alert, active, and in no apparent distress.  The doctor recommended that Reed limit C.A.R.'s liquid intake after dinner and continued her prescription for Adderall.

When C.A.R. repeatedly failed a hearing screening, Reed brought her in to see her surgeon on November 26, 2003.  Tr. at 396.  Peter J. Koltai, M.D., noted drainage in the right ear and took a culture for analysis.  He also changed C.A.R.'s antibiotic.

At the Bureau's request, Dr. Kalata submitted a report of C.A.R.'s condition in October or December of 2003.[4]  Tr. at 426-28.  She diagnosed C.A.R. as suffering from attention deficit disorder, hearing problems, and lead poisoning.  She noted that C.A.R. was having problems in school and might need an adjustment in her medication or in her IEP.

Treatment notes from a visit to the Cleveland Clinic on December 15, 2003 indicated that C.A.R. was having problems with incontinence day and night, with 3-4 accidents daily.  Tr. at 291-92.  They also recorded that C.A.R. was positive for asthma, recurrent ear infections, gastrointestinal reflux, and the sickle cell trait.  The notes indicated a past medical history of high lead levels, global developmental delays, a hospitalization for ataxia, and a hospitalization for asthma.

---

[4] Dr. Kalata reported signing the document on October 16, 2003 but recorded that she last examined C.A.R. on December 10, 2003.

An Audiological Record from the Cleveland Public Schools dated January 13, 2004 noted that C.A.R. had failed a hearing screening and was suffering from mild hearing loss bilaterally. Tr. at 438.

Kevin Goeke, Ph.D., reviewed C.A.R.'s file and completed a Childhood Disability Evaluation Form on January 28, 2004. Tr. at 439-44. He determined that C.A.R. had less than marked limitations in acquiring and using information, moving about and manipulating objects, and health and physical well-being and had no limitations in attending and completing tasks. interacting and relating with others, and caring for herself. Kamala Saxena, M.D., a state agency physician, affirmed this opinion on January 29, 2004.

An Audiological Record from the Cleveland Public Schools on November 7, 2005 noted that C.A.R. had mild bilateral hearing loss. Tr. at 202. The tester recommended medical management and a re-test when C.A.R.'s ears were clear. A re-test on January 13, 2006 noted mild hearing loss and flat tympanograms bilaterally with a conductive overlay for at least one ear. Tr. at 203. C.A.R.'s hearing was judged normal, however. The tester recommended continued otologic management and a re-check of her hearing in accordance with re-testing protocols.

On April 19, 2006 Robert F. Dallara, Jr., Ph.D., a psychologist, examined C.A.R. at the request of the Bureau. Tr. at 469-74. Dr. Dallara noted C.A.R.'s hearing loss, reflux, asthma, late toilet training, and a history of elevated lead levels. He found C.A.R. to be co-operative but having problems with attention. Her speech was 90% intelligible in a known context and 80% intelligible in an unknown context. Her mood was generally good, but both C.A.R. and Reed reported that she could become irritable when frustrated. Reed also reported that C.A.R. still had problems with bedwetting, had some difficulties buttoning her

clothes, and was having trouble with grades because she had been moved from special classes to regular classes due to cutbacks. C.A.R. was alert and oriented. Reed reported some problems with memory and that C.A.R. could remember a 2-step instruction about half the time. Dr. Dallara found C.A.R.'s insight and judgment to be slightly impaired. C.A.R. scored 80 on the Wechsler IQ test, with a verbal score in the average range, a perceptual reasoning score in the borderline range, and all other scores in the low average range. C.A.R. had difficulties on most visual-motor tasks, and she had an impaired gait and difficulties manipulating objects. Dr. Dallara diagnosed C.A.R. as suffering from attention-deficit/hyperactivity disorder, an unspecified cognitive disorder, and an unspecified communication disorder. He assigned C.A.R. a GAF of 60.[5] He also assessed C.A.R. as functioning at 4/5 of the age-appropriate cognitive level, 3/4 of the age-appropriate communicative level, 3/4 of the age-appropriate level in her motor skills, 4/5 of the age-appropriate level in socialization, 4/5 of the age-appropriate level in behavior patterns, and 3/4 of the age-appropriate level in concentration.

Michael A. Harris, M.D., a state agency physician, examined C.A.R. on April 25, 2006. Tr. at 476-82. Dr. Harris noted a history of urinary incontinence, sleep apnea, frequent ear infections, ear tube placement, and attention problems. C.A.R.'s behavior was pleasant and appropriate. He found no abnormalities in her strength, sensation, reflexes, range of motion, gait, or hearing. He also found no warmth, swelling, tenderness, or edema. Dr. Harris concluded, "I am not clear why she came in for a disability evaluation."

---

[5] A GAF of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflict with peers of co-workers).

*B.	Educational evidence*

In October 2005, the Bureau asked Kathleen Hopkins, C.A.R.'s second grade teacher, to complete a Teacher's Questionnaire.  Tr. at 184-91.  Hopkins assessed C.A.R.'s reading as at the low average level and her math and written language as below average.  She opined that C.A.R. has slight problems with comprehending oral instructions, understanding school and content vocabulary, understanding and participating in classroom instructions, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned material.  Hopkins also opined that C.A.R. had obvious problems with reading and comprehending written material, comprehending and doing math problems, expressing ideas in written form, and applying problem-solving skills in class discussions.  Hopkins found no problems with attending and completing tasks, interacting and relating to others, moving about and manipulating objects, or caring for herself.  She noted that C.A.R. is independent, completes tasks as best she can, and listens well.  Hopkins also wrote that C.A.R. sat in the front of the room due to hearing difficulties and to help her stay on task.  Finally, Hopkins noted that C.A.R.'s bladder problems caused her to go to the bathroom frequently.

In October 2005, the Bureau asked Rita Rand, C.A.R.'s third grade teacher, to complete a Teacher's Questionnaire.  Tr. at 194-201.  Rand assessed C.A.R.'s reading as at the low average level and her math and written language as below average.  She opined that C.A.R. has slight problems with reading and comprehending written material, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.  Hopkins also opined that C.A.R. had a serious problem with comprehending and doing math problems.

12

Rand found no problems with attending and completing tasks, interacting and relating to others, moving about and manipulating objects, or caring for herself. Rand also noted C.A.R.'s frequent use of the restroom.

*C.     Hearing testimony*

At the March 13, 2006 hearing Reed testified that C.A.R. has problems with incontinence and bedwetting. She also explained that C.A.R. has trouble running, riding a bike, and climbing because she does not bend her knees. According to Reed, C.A.R. also has difficulties hearing even when sounds are very loud, difficulty comprehending what she reads, and difficulty doing addition and subtraction. Reed emphasized that C.A.R.'s hearing seemed to be getting worse. C.A.R.'s recent grades were Cs and Ds and one F. Dr. Morrow-White testified that she was somewhat puzzled by contradictory evidence in the record, but she concluded that none of C.A.R.'s physical impairments met or equaled a listing. Both the ME and the ALJ agreed, however, that additional psychological testing of C.A.R. would be helpful in resolving some of the contradictory evidence in the record. The hearing was adjourned, therefore, pending additional testing.

On November 13, 2006, the ALJ held a supplemental hearing at which Reed and Dr. Morrow-White testified. The reports from Drs. Dallara and Harris were made part of the record. Reed again testified regarding C.A.R.'s problems with hearing, running, asthma, bedwetting, buttoning, following instructions, and maintaining attention. The ME reviewed C.A.R.'s records, including the new reports of Drs. Dallara and Harris, and concluded that none of C.A.R.'s impairments met or medically equaled a listing. She also testified that although C.A.R. had limitations in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical

well-being, these limitations were less than marked.

   III. Standard for Determining Disability for an Individual Under Eighteen Years of Age

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). The Commissioner reaches a determination as to whether a claimant under the age of eighteen is disabled by way of a three-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §416.924(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §416.924(b). A "severe impairment" is one which is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations . . . ." *Id.* Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets, medically equals, or "functionally equals" a listed impairment, the claimant is disabled. 20 C.F.R. §416.924(b). A severe impairment "functionally equals" a listed impairment if it results in "marked" limitations in two domains of functioning or results in an "extreme" impairment in a single domain of functioning. 20 C.F.R. §416.926a(a). The domains of functioning consist of the following:

   (i)    Acquiring and using information;
   (ii)   Attending and completing tasks;
   (iii)  Interacting and relating with others;
   (iv)   Moving about and manipulating objects;
   (v)    Caring for yourself; and
   (vi)   Health and physical well-being.

20 C.F.R. §416.926(b)(1).

In making a determination regarding functional equivalence, the Commissioner must consider the interactive and cumulative effects of all the impairments for which there is any evidence, including any impairment that is not severe. 20 C.F.R. §416.926a(a). The Commissioner's assessment must include such factors as how well the claimant can initiate and sustain activities, how much extra help the claimant needs, the effect of structured or supportive settings, how well the claimant functions in school, and the effects of medications or other treatment. 20 C.F.R. §416.926a(a)(1-3).

### IV. Summary of Commissioner's Decision

In determining that C.A.R is not disabled, the ALJ made the following relevant findings:

1. The claimant was born on March 10, 1997. She was almost 6 years old on March 3, 2003, the date the application was filed. She is 9 years old as this decision is issued.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The claimant has the following severe impairments: borderline intellectual functioning, attention deficit hyperactive disorder, obesity, and enuresis.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the requirements of an impairment listed in the Listing of Impairments.

5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

6. The claimant has not been disabled, as defined by the Social Security Act, since March 3, 2003, the date the application was filed.

Tr. at 17, 25 (citations omitted). In determining that C.A.R did not have an impairment or combination of impairments that functionally equals a listing, the ALJ determined that although C.A.R. had limitations in the domains of acquiring and using information, attending

15

and completing tasks, moving about and manipulating objects, and health and physical well-being, these limitations were less than marked.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Reed v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

Reed contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to consider and give weight to all the evidence, including the evidence of Reed, and because the ALJ failed to consider the combined effect of C.A.R.'s impairments.  Defendant replies that the ALJ considered and properly weighed all the evidence and fully considered the effects of all C.A.R.'s impairments.

Reed cites the reports of Drs. Stanford, Leach, and Dallara and the testimony of Reed in arguing that the ALJ failed to consider and give weight to all the evidence.  The ALJ discussed the reports of Drs. Stanford, Leach, and Dallara in making his decision, tr.

16

at 18-20, and discussed Reed's testimony, tr. at 17-18. In finding that the testimony of Reed was not entirely credible, he compared her testimony to other evidence in the record. He also determined that the evidence in the record supported the ME's opinion that although C.A.R. had limitations in the domains of acquiring and using information, attending and completing tasks, moving about and manipulating objects, and health and physical well-being, these limitations were less than marked. As this determination is one that a reasonable person could reach from the record, the determination is supported by substantial evidence. Reed's contention to the contrary is not well-taken.

Reed also contends that the ALJ failed to consider the combined effect of C.A.R.'s impairments. The only support that Reed offers for this contention is the assertion that "consideration of Plaintiff's severe borderline intellectual functioning, attention deficit disorder[,] hearing loss[,] and enuresis synergistically leads to a finding of disability." Plaintiff's Brief on the Merits, Doc. No. 14, p. 7.

The ALJ noted his obligation to consider the combination of all C.A.R.'s impairments in determining whether they medically or functionally equaled a listing. Tr. at 15-16. The ALJ also correctly noted that the method by which he was to determine whether C.A.R.'s impairments functionally equaled a listing was to perform a domain by domain analysis of her functioning, considering the impact of all her impairments upon each domain. This is the analysis that the ALJ apparently performed. Tr. at 21-25. The ALJ's conclusion that considering all her impairments C.A.R. did not suffer from a marked limitation in any of the six domains of functioning is a conclusion that a reasonable person might reach. Substantial evidence, therefore, supports the ALJ's conclusion that C.A.R.'s impairments do not in synergy require the conclusion that C.A.R. is disabled. Again, Reed's argument

to the contrary is not well-taken.

## VII. Recommendation

For the foregoing reasons, the Court should AFFIRM the decision of the Commissioner.


/s/ Nancy A. Vecchiarelli
U.S. Magistrate Judge

Date: June 12, 2008

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v.Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**